ROLAND PRICE,

                              Plaintiff,

          v.                                        Case No. 15-cv-774-pp

PHILLIP FRIEDRICH,

                              Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 62) AND DISMISSING CASE

The plaintiff, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendant violated his civil rights. Dkt. No. 1. The court screened his third amended complaint, dkt. no. 28, on August 7, 2017 and allowed him to proceed with two First Amendment claims alleging (1) that the defendant seized legal materials from him in retaliation for filing inmate grievances and (2) that the defendant's seizure of the legal materials denied him access to the courts. Dkt. No. 29 at 4-5.

On July 16, 2018, the court granted the defendant's motion for partial summary judgment and dismissed the retaliation claim. Dkt. No. 57. The defendant since has filed a motion for summary judgment on the plaintiff's access-to-the-courts claim. Dkt. No. 34. The court will grant that motion and dismiss the case.

## I.    FACTS[1]

During the events described in the third amended complaint, the plaintiff was an inmate at the Wisconsin Secure Program Facility ("WSPF"). Dkt. No. 64, ¶1. The defendant was a "Restrictive Housing Property Officer in the Property Department" at WSPF. Id. at ¶2.

### A.    The Plaintiff's Legal Materials

On December 14, 2010, the plaintiff was placed in Temporary Lock up ("TLU") (which is in the Restrictive Housing Unit, or RHU) while Captain Lebbeus Brown (no longer a defendant) conducted an investigation into whether the plaintiff had "made arrangements" to help another inmate with legal work, at a cost of $800. Id. at ¶5. The defendant attests that making such arrangements violated the "rule of Enterprises and Fraud under Wis. Admin. Code §DOC 303.32."[2] Dkt. No. 65 at ¶5. Because the property allowed an inmate in the RHU is limited, staff pack up, search and inventory the property of inmates coming into the RHU from general population. Dkt. No. 64 at ¶6.

Officer "Brown-Lucas"—presumably the same officer Brown who was conducting the investigation that landed the plaintiff in TLU—inventoried the plaintiff's property twice—once on December 13, 2010 (the day before the plaintiff went into TLU) and again on December 15, 2010 (the day after the plaintiff went into TLU). Id. at ¶8. In connection with the two inventories,

---

[1] Among the documents the court considered in compiling the facts is the plaintiff's third amended complaint, dkt. no. 28, which the court must construe as an affidavit at the summary judgment stage. (Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996)).

[2] Perhaps the administrative code numbers have changed in recent years; the court's research indicates that the Enterprises and Fraud provision of the administrative code is §DOC 303.36. Subsection (1) of that policy prohibits inmates from engaging in businesses or enterprises or selling anything that isn't allowed by the administrative code.

Brown-Lucas filled out three forms—an Allowable Property List dated December 13, 2010; an Allowable Property List dated December 15, 2013, and a "Property Inventory—Male" form dated December 15, 2010. Id. Brown-Lucas filled out these forms to "make sure all of [the plaintiff's] property that he possessed at the time he was being place in [TLU] was accounted for." Id. at ¶9. The defendant did not have any part in packing, sorting or inventorying the plaintiff's property during his placement in TLU. Id. at ¶16.

The December 13, 2010 Allowable Property List indicated that the plaintiff had been approved to have basic hygiene items (including deodorant, a comb, lip balm, shower shoes, soap and nail clippers) and one pad of paper. Dkt. No. 65-3 at 1. The plaintiff's signature and printed name, along with the date "12-13-10," appear at the bottom of the form. Id.

The December 15, 2010 Allowable Property List approved additional items for the plaintiff, including prescription glasses, prescription medications, "ALL Legal materials & miscellaneous papers—limit one 20 x 20 x 20 box," two pads of paper and three legal-size manila envelopes.[3] Dkt. No. 65-3 at 2. The plaintiff signed this form, dating it "12-15-10." Dkt. No. 65-3 at 2.

The defendant explains that inmates in the RHU may have their legal materials. Dkt. No. 64 at ¶11. An inmate with an active case may keep as many legal materials as fit in a 20x20x20 inch box. Id. If the inmate has more legal materials than will fit in a box that size, staff members allow him to sort through the materials and decide which ones he wants to keep in the cell with him; "[t]he remainder will be destroyed or sent out at the inmate's expense, unless it is legal material that pertains to an active case." Id. at ¶12. If the

---

[3] According to the defendant, any non-allowed property the plaintiff had at the time he was placed in TLU would have been stored in the property room until the plaintiff was moved back to general population. Dkt. No. 64 at ¶15.

excess material relates to an active case, the inmate must ask the warden for permission to store the excess materials short-term. Id. If the warden approves the short-term storage, the prison stores the excess materials in the property warehouse and gives the inmate a property receipt. Id. at ¶13. The defendant indicates that there is "no record of excess materials being stored" for the plaintiff. Id.

After the investigation into the alleged $800 legal work arrangements was completed, the plaintiff received a conduct report for Enterprises and Fraud. Id. at ¶17. On January 25, 2011, a hearing officer found the plaintiff guilty of "enterprises and fraud." Id. at ¶¶17-18. The officer imposed a disposition of 120 days of "disciplinary separation." Id. As a result, the plaintiff remained in RHU until May 25, 2011. Id. at ¶¶18, 20. The defendant did not play any role in investigating the plaintiff's conduct, in issuing the conduct report or in the hearing. Id. at ¶19.

On May 25, 2011, the plaintiff was released from RHU, and the defendant and Correctional Officer Bast (not a defendant) sorted and inventoried the plaintiff's property so that he could move back to general population. Id. at ¶20; see also Dkt. No. 65-6. This was the first time the defendant became involved with the plaintiff's property. Dkt. No. 64 at ¶21. The officers completed a property inventory, which they signed and dated May 25, 2011. Dkt. No. 65-6. The plaintiff also signed the inventory form. Id. The form indicates that the plaintiff received "Legal Material," miscellaneous papers/letters and seventeen three-ring binders. Id. at 2. The defendant says that he didn't sort through or inventory the individual legal papers. Dkt. No. 64 at ¶23. The plaintiff claims in his declaration opposing summary judgment that

there were twenty-four binders, and that Brown had not properly recorded them. Dkt. No. 75 at ¶¶7-8.

According to the defendant, he and his fellow officer found that the following items were "damaged" or "altered": a Complete Bible Handbook, a Keyword Bible, an Orthodox Study Bible, Bible maps and charts, Dictionary/Thesaurus, Dipole antenna, two folders, miscellaneous magazine cut-outs "that were taped together," and seven photos. Dkt. No. 64 at ¶24. The defendant asserts that these items "had been covered with tape." Id. at ¶25. It's against the prison rules to cover items with tape—that's considered "altering" property—and the defendant says he wasn't aware of anyone giving the plaintiff permission to put tape on the property. Id. at ¶¶26-28.

The defendant says that as to the two folders (covered with tape), the officers confiscated only the folders themselves—he says that if there had been papers or legal documents in the folders, he would have removed those and given them to the plaintiff. Id. at ¶29. The plaintiff has declared "[u]pon information and belief" that the properties taken "included legal properties." Dkt. No. 75 at ¶8.

The defendant says he also found several items "in excess of the allowed property limits": seven socks, a t-shirt, three pairs of underwear, "coax" (coaxial cable), three pairs of "sweatbands," one soap dish, and thirty photographs. Id. at ¶30. The defendant confiscated these items and listed them on a "Property Receipt/Disposition" form; the plaintiff signed and dated the form, and it bears notes made either by the plaintiff or the defendant saying what the plaintiff wanted prison staff to do with the items (such as destroy them or mail them). Id. at ¶31; Dkt. No. 65-6.

The plaintiff stated in the third amended complaint in this case that the defendant violated his right "to ownership of legal property primarily his [legal properties]." Dkt. No. 28 at ¶7 (brackets in original). The plaintiff alleged that his property "was seized." Id. He says that when he was being released from segregation, the defendant declared the plaintiff's property to be contraband "[s]imply and entirely based on clear scotch tape being used on it." Id. at ¶8. The plaintiff asserts that he had "authorized authority to the uses of scotch tape to affix mandatory name tags for identification purposes." Id. He says the tape was used for "basic normal uses of scotch tape." Id. The plaintiff says that he "pleaded" with the defendant "that the scotch tape was a normal authorized property item sold through canteen," and that his use of the tape "[was] not any security risk nor unauthorized." Id. at ¶10. He says that despite his pleas, the defendant was "furious argumentative and aggressive." Id. The plaintiff asserts that the defendant did not issue him a conduct report for contraband. Dkt. No. 28 at ¶11.

The defendant explains that the confiscated property was held in the property room to give the plaintiff an opportunity to decide what he wanted done with it (or to file a grievance). Dkt. No. 64 at ¶32. He says he did not take or retain any legal materials or transcripts from the plaintiff—if he had, he would have noted that on the Property Receipt/Disposition form. Id. at ¶34.

The next month, in June 2011, the plaintiff filed five inmate grievances regarding issues with his property. See Dkt. No. 40-1 at 4. The plaintiff complained that certain items should not have been confiscated (such as his Bible and rosary), that he was missing legal transcripts, and that he thought the defendant was going to dispose of his property before he could exhaust administrative remedies to the corrections complaint examiner ("CCE"). Id.

Because these grievances were pending, the property room held all the plaintiff's confiscated items and didn't destroy or mail out any of the plaintiff's property at that time. See Dkt. No. 64 at ¶37.

On June 16, 2011, Institution Complaint Examiner ("ICE") Kelly Trumm contacted the defendant regarding the plaintiff's inmate grievance about his missing legal transcripts. Id. at ¶38. The defendant says that he searched the property room and didn't find any legal transcripts or legal materials. Id. at ¶39. The defendant reiterated in his findings of fact that he didn't hold any legal materials or transcripts from the plaintiff's property. Id. at ¶40. The defendant maintains that he confiscated only the property that was noted on the Property Receipt/Disposition form. Id. at ¶¶32, 40.

On June 22, 2011, the plaintiff sent the defendant an Interview/Information Request stating that he received a decision on his inmate grievances and that he had until June 27, 2011 to make arrangements for his property. Id. at ¶41; Dkt. No. 65-9 at 1. The plaintiff also submitted a disbursement request for money to pay for mailing the items, indicating that the property should be sent to his mother, Helen Price, and giving her address. Dkt. No. 64 at ¶42; Dkt. No. 65-9 at 2. The defendant read the address as "2482 W Aver Ave." Dkt. No. 65 at ¶45. The defendant says that, using "Spee-Dee delivery services," he shipped the plaintiff's property to the address the plaintiff had provided. Id. at ¶46. He states, however, that around July 14, 2011, the package was returned by Spee-Dee delivery with an indication that the address was incorrect. Id. The defendant says he notified the plaintiff that the property had been returned. Id. The property went back to the property room. Id. at ¶47.

The plaintiff avers that the defendant wrote down the incorrect address on the Spee-Dee delivery slip. Dkt. No. 75 at ¶22. The plaintiff says that he had his mother call the defendant because his mother hadn't yet received the property. Dkt. No. 28 at ¶12. The plaintiff asserts that his mother told the defendant that her address had been the same for more than fifty years and that she'd not received any property. Id. The plaintiff states that the defendant specified (whether to the plaintiff or the plaintiff's mother is not clear) that the defendant had used Spee-Dee and that "a receipt signed by him Spee-Dee provide that they were unable to deliver the property." Id. The plaintiff says that he asked for a copy of the receipt, but that "no signature appears on it at all of [the defendant]," and that the defendant "again is willfully and intentionally telling a ball-face-lie and using the DOC in protection of that lie." Id.; Dkt. No. 75 at ¶23.

The defendant provided with his summary judgment materials what appears to be a copy of the Spee-Dee receipt, bearing a red sticker that says, "Return to Shipper." Dkt. No. 65-10. There is an asterisk between the words "Incomplete Address" and "Incorrect Address" as the reason given for the return. There are three sets of handwritten notes on the document. One notation says, "I/m notified 7·14·11 By CO Friedrich at cell front." Id. It appears to bear the defendant's signature next to the date 7-14-11. Another notation appears next to the "Ship To" address. It says, "Talked to 8-4-11," and bears an arrow pointing to the defendant's mother's name, Helen Price. Beneath the "2482 W. Aver Ave." address are the words "Auer Ave." Id. The final notation says, "Given a new request on 8-5-11." Id.

The defendant says that on August 4, 2011, he spoke with the plaintiff's mother, who gave him the correct mailing address. Dkt. No. 64 at ¶45. When

the plaintiff got a new disbursement request the next day—August 5, 2011—he didn't have enough money in his account to cover the cost of mailing the package. Id. at ¶46. The defendant held on to the plaintiff's property until September 14, 2011, waiting for the plaintiff to submit payment for mailing the items to his mother; the defendant checked the plaintiff's account five times during that period, to see if he had accrued the money. Id. at ¶¶47-48. By September 14, 2011, the plaintiff still didn't have enough money, so the property was destroyed. Id. at ¶48. The defendant says the property was destroyed because "there was simply not enough room to store property indefinitely." Id. at ¶49. The defendant maintains that he destroyed only the property listed on the Property Receipt/Disposition form. Id. at ¶50. He states that he didn't destroy any legal transcripts or other legal materials. Id.

The plaintiff asserts that "[o]n or about **09/14/11** and once more on **5/31/12**. [the defendant] straightforwardly stated [the plaintiff's] property to be contraband and he acted retributively about his resolution while under the color of state law to punish [the plaintiff]." Dkt. No. 28 at ¶9. The plaintiff claims that the defendant "committed the ungodly act of theft . . . and destruction of [the plaintiff's] vital property," and that he "knowingly and willingly demolished and trashed [the plaintiff's] property inorder to carry out his cruel bigoted deed to stop [the plaintiff] of filing complaints and to stop any legal action what so ever by [the plaintiff]." Id. at ¶14. The plaintiff asserts that the defendant was aware that the plaintiff had filed an inmate complaint "and knew his action shall terminate any further attempts by [the plaintiff] to litigate claim's against any governmental official once and for all." Id. at ¶16.

About a year later, on June 1, 2012, the plaintiff was transferred to Columbia Correctional Institution. Dkt. No. 64 at ¶53. Before the transfer, the

plaintiff's property again was sorted and inventoried. Id. at ¶51. The defendant does not say who sorted and packed the plaintiff's property before the transfer; the plaintiff asserts that it was the defendant, dkt. no. 28 at ¶17. Someone completed a Property Inventory form and gave the plaintiff the opportunity to sort through his things; the plaintiff signed the form on May 31, 2012. Dkt. No. 64 at ¶52; Dkt. No. 65-7. The defendant says that based on his review of the records, all the plaintiff's property was sent to Columbia; nothing remained at WSPF. Id. at ¶55. The defendant had no further involvement regarding the plaintiff's property. Id. at ¶54. He doesn't know what property the plaintiff received at Columbia. Id. at ¶56.

B.    The Plaintiff's Legal Activity in State Court

1.    *The Plaintiff's Criminal Appeal*

On November 19, 2010, the plaintiff filed a notice of appeal in Milwaukee County Case Number 2006CF640. Dkt. No. 64 at ¶¶78-79. After granting several extensions of time, the Wisconsin Court of Appeals set the deadline for the plaintiff to file his brief deadline at June 20, 2011. Id. at ¶¶80-81. The plaintiff timely submitted both his appellant's brief and his reply. Id. The defendant asserts that in the plaintiff's briefing materials, he alleged that he didn't have a copy of his legal transcripts because his criminal defense attorney refused to provide them. Id. at ¶84. The defendant says that the plaintiff didn't mention the defendant in his appellate pleadings or allege that he was unable to pursue his appeal because the defendant destroyed his legal materials. Id. at ¶83. The Wisconsin Court of Appeals affirmed the circuit court's decision on November 6, 2012. Id. at ¶82.

In his summary judgment materials, the defendant provided a copy of the plaintiff's briefs in his criminal appeal. The plaintiff's opening brief—

including the cover and the table of contents—was fifty-four pages long. Dkt. No. 67-3 at 20-74. It contains quotations from police reports and, perhaps more to the point, extensive quotes from transcripts. For example, it contains quotes from the hearing on the plaintiff's motion to suppress. Id. at 31-32. It contains quotes from the prosecutor's direct examination of a Sgt. Heyrman. Id. at 39. It appears to contain quotes from arguments presented to the court. Id. at 40-41. While the brief jumps from case cites to argument to quotes from documents, it appears to be filled with quotes from legal materials from the plaintiff's criminal case.

The plaintiff's reply brief, including the table of contents, was eleven pages long. Id. at 75-86. It specifically identified errors he believed his attorneys had made in representing him, provided quotes from the trial judge, and argued that his right to appeal had been violated because his lawyer "and or the *State* failed to provide complete transcript." Id. at 81 (emphasis in original).

In his third amended complaint in this case, the plaintiff alleged that the defendant destroyed his right to appeal, and that having his transcripts and other legal materials stolen rendered his appellate pleadings unintelligible and incomprehensible. Dkt. No. 28 at ¶27.

> 2. *The Plaintiff's Writ of Certiorari*

On March 31, 2011, the plaintiff filed an offender complaint alleging procedural errors in Conduct Report #2155463—the report alleging that he had engaged in enterprise and fraud. Dkt. No. 67-1 at 9-10. The plaintiff received a final decision on the merits from Office of the Secretary of the Department of Corrections on May 20, 2011. Id. at 8-9; Dkt. No. 67-2 at 23. The plaintiff later sent the Dane County Circuit Court a letter, postmarked July 26, 2011, asking

for an extension of time to challenge the Secretary's decision through a writ of *certiorari*. Dkt. No. 64 at ¶70. A Prisoner Litigation Staff Attorney at Dane County responded to the letter on July 28, 2011, stating that there was no open case in which the court could rule on his request for an extension of time. Id. at ¶71. The staff attorney told the plaintiff that when he did file his petition for writ of *certiorari*, he could raise the reasons for his delay in that filing. Id.

Three months later, on October 25, 2011, the plaintiff filed his writ of *certiorari* and explained that his filing was late because he didn't have access to the law library and didn't have inmate legal assistance. Id. at ¶¶72-73. He made no mention of the defendant having destroyed his legal materials. Id. at ¶77. The Dane County Circuit Court dismissed the petition for a writ of *certiorari* because it was untimely filed, and because the plaintiff failed to provide a sufficient reason for why his filing was late. Id. at ¶74. The plaintiff appealed the decision, and the Wisconsin Court of Appeals upheld the circuit court's dismissal. Id. at ¶¶75-76.

In the third amended complaint in this case, the plaintiff asserted that he missed the mandatory deadline to file his petition for a writ of *certiorari*, but did not allege that it was because of the defendant. Dkt. No. 28 at ¶¶22-23. Rather, he alleged that the mailroom staff withheld a document that he needed, and that because he was forced to use the U.S. mail (due to prison policy) he couldn't meet the filing deadline. Id. at ¶23.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Analysis

"There is an independent constitutional right to meaningful access to the courts." Huber v. Anderson, 909 F.3d 201, 210 (7th Cir. 2018) (citing Bounds v. Smith, 430 U.S. 817, 824 (1977)). "[E]fforts by state actors to impede an individual's access to courts . . . may provide the basis for a constitutional claim under 42 U.S.C. § 1983." Harrell v. Cook, 169 F.3d 428, 432 (7th Cir. 1999) (quoting Vasquez v. Hernandez, 60 F.3d 325, 328 (7th Cir. 1995)). "A prisoner states an access-to-courts claim when he alleges that even though he

successfully got into court by filing a complaint or petition challenging his conviction, sentence, or conditions of confinement, his denial of access to legal materials caused a potentially meritorious claim to fail." Marshall v. Knight, 445 F.3d 965, 969 (7th Cir. 2006). To prove such a claim, "a prisoner must show that unjustified acts or conditions 'hindered his efforts to pursue a legal claim.'" Nance v. Vieregge, 147 F.3d 589, 591 (7th Cir. 1998) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)). Actions by a prison official that are "merely 'negligent' [are] insufficient to support . . . a denial of access to the courts . . . claim under § 1983." Hunter v. Welborn, 52 Fed. App'x 277, 280 (7th Cir. 2002) (citations omitted).

1. *Did Any of the Plaintiff's Legal Materials Disappear?*

The plaintiff argues that if he'd had the legal materials that he claims were taken and destroyed, he would have been able to do a better job in his criminal appeal and in his attempt to obtain court review of the enterprise-and-fraud disciplinary complaint. The first question is whether there is any evidence that anyone took or destroyed the plaintiff's legal materials.

The evidence shows that a day or so after the plaintiff was placed in TLU, he was approved to have "ALL Legal materials & miscellaneous papers—limit one 20 x 20 x 20 box." Dkt. No. 65-3 at 2. There is no record of the specific items included in "ALL Legal materials & miscellaneous papers." There is no way to know what prison staff let the plaintiff keep with him in TLU.

When the plaintiff left the RHU on May 25, 2011, the defendant and Bast filled out a form indicating that they had returned legal materials, miscellaneous papers and seventeen three-ring binders to the plaintiff. Dkt. No. 65-6. There is no description of what the "legal materials" were or what was in the binders, and the defendant says he didn't catalogue each of them

14

separately. The defendant readily admits that he and Bast confiscated several items from the plaintiff that day but he swears that none of those items were legal materials. The plaintiff's name appears on the property receipt/disposition form. Id.

In June 2011, the plaintiff filed several inmate complaints about his property. On June 1, 2011, he signed a complaint alleging that the defendant took from him items that had tape on them; he listed the items as "Complete Bible Hand Book, Key Word Study Bible, Orthodox Study Bible, Bible map chart book, dictionary, folders expending, photo's." Dkt. No. 40-2 at 10. This complaint does not mention legal materials. On the same date, the plaintiff signed another complaint about property he'd bought before a rule change—a quick-connect cable, a gold pendant, wrist bands and a gold cross. Dkt. No. 40-3 at 10. This complaint did not mention legal materials.

On June 14, 2011, the plaintiff signed a third complaint. Dkt. No. 40-4 at 1. This one stated,

> My official copy of my legal <u>transcripts</u> for my criminal appeal and civil appeal is missing "per confiscation by "<u>property</u> <u>room</u>" The official copies are needed to perfect the appeal I'm being denied access to the court" →Issue← Transcripts are missing from property

Id. Although criminal cases involve many hearings (hearings on motions, evidentiary hearings, trials, sentencing hearings), the plaintiff did not say which of the transcripts for his criminal appeal he was missing. He did not describe his civil appeal, or describe the transcripts missing for that appeal.

On June 16, 2011, Kelly Trumm recommended that the complaint be dismissed, stating that she had talked to the defendant, who had said, "Nope. I have nothing. Checked his file and all." Id. at 3. The defendant asserts that he searched the property room but could not find any transcripts and says again

that he did not confiscate any legal materials from the plaintiff. Dkt. No. 64 at ¶¶39-40.

Other than the plaintiff's assertions, there is no evidence of what "legal materials" the plaintiff had before he was placed in TLU, or what legal materials he got when he came out. The plaintiff's description of what "legal materials" went missing has changed over time. In the June 14, 2011 inmate complaint he said that transcripts were missing and alleged that they had been "confiscated" by the "property room." In his appeal of the dismissal of the complaint, the plaintiff alleged that when he was taken to TLU "staff" did not list twenty-four binders on the property sheet, and mentioned Brown. Dkt. No. 40-4 at 5. He said that the defendant "wrote down 17 binders now [illegible] just destroy everything before the decision." Id. at 6. Either the plaintiff was implying that he was missing not only transcripts but binders, or he was alleging that the missing transcripts were in the allegedly missing binders—it is not clear. By the time he filed his third amended complaint in this lawsuit, the plaintiff generally referenced his "property" and "legal property," without describing the allegedly missing property. When he filed his response to the summary judgment motion, the plaintiff alleged that his "legal possessions" had included "Courts opinions, court record, and courts brief(s)," dkt. no. 73 at 2, as well as Black's Law Dictionary, law books (such as Legal Writing a Systemic Approach and Modern Criminal Procedure), handbooks (such as the Seventh Circuit handbook), checklists, rules of evidence, and "[t]hree ring binders *containing* Criminal and Civil case laws, in the U.S. Supreme Court U.S. Appeals Court U.S. District Court's alongwith, Wis. Supreme Court and Appeals courts cases citations," dkt. no. 73 at 19-21.

Because there is no evidence indicating what legal materials the plaintiff had before he went to TLU, it is hard to imagine how a reasonable jury could find that some of those materials had gone missing.

  2. *If the Plaintiff's Legal Materials Disappeared, Did the Defendant Take Them?*

Even if a jury were to decide that some of the plaintiff's legal materials went missing, and assuming it could figure out what those materials were, the next question would be whether there is any evidence that the *defendant* confiscated them. The record reflects that the plaintiff was approved to have all his legal materials with him in TLU as of December 15, 2010. The day the plaintiff was released from the RHU—May 25, 2011—he signed off on the property receipt the defendant and Bast had prepared; there is no indication that he told anyone at that time that legal materials were missing. The first time he mentioned missing legal documents was in the inmate complaint he signed three weeks later, on June 14, 2011. When he filed that complaint, the plaintiff alleged that the transcripts were confiscated by the "property room." As time went on and the plaintiff appealed the dismissal of his complaint and then brought this lawsuit, he specifically accused the defendant of taking the missing materials.

The plaintiff appears to base his accusation on the following facts: (a) the defendant was one of the two officers who inventoried his property when he left the RHU, and who confiscated some of his personal property at that time, (b) the defendant was the manager of the property room, (c) the defendant was the one who reported to the plaintiff that that his confiscated property hadn't made it to his mother, (d) the defendant had the confiscated property destroyed in September 2014, and (e) according to the plaintiff, the defendant was angry with the plaintiff. Much of this, in the court's view, is speculation and

conclusion, and a plaintiff cannot rely on speculation and conclusory allegations to establish an access to the courts claim. <u>See</u> <u>Rosario v. Reddy</u>, No. 95 C 2610, 1996 WL 145771, at *1 (N.D. Ill. Mar. 27, 1996).

While the defendant *was* one of the two officers who inventoried the plaintiff's property when he left RHU (and who confiscated some of that property), the events the plaintiff describes in the third amended complaint cover a nine-month period, from December 2010 (when he went into TLU and received his legal materials) to September 2011 (when the confiscated property was destroyed). The evidence does not indicate how many people at the prison had access to the plaintiff's property during that time; the plaintiff mentions Brown (and alleges at some points that Brown had some part in what happened) and the defendant, but likely there were others. The fact that the defendant was the manager of the property room does not, by itself, prove that the defendant took any legal materials from the plaintiff. The plaintiff admits that the defendant communicated with him about trying to ship the property to his mother, even providing the plaintiff with the Spee-Dee receipt when the plaintiff requested it. The plaintiff alleges that the defendant lied about trying to send the property to his mother, but it makes little sense that if the defendant wanted to punish the plaintiff for something, he would make up an elaborate story about holding the confiscated property and trying to mail it. It seems more likely that the defendant simply would have destroyed the property right away.

Finally, as to motive, the plaintiff asserts that the defendant got angry with the plaintiff when, during the inventory of the plaintiff's property on his release from the RHU in May 2011, the plaintiff challenged the confiscation of property that had tape on it. The plaintiff alleged in the third amended

18

complaint that at that point, the defendant was "angry heated yet infuriated" and threatened to send the plaintiff back to segregation. Dkt. No. 28 at ¶10. The plaintiff also alleged that the defendant took and destroyed his property to prevent the plaintiff from "filing of inmate complaints and to stop any legal action" by the plaintiff. Id. at ¶14.

Though the court thinks it unlikely, perhaps a reasonable jury might credit the plaintiff's assertion that the defendant was so angry about the argument over the taped items that he would destroy the plaintiff's legal materials. Perhaps a reasonable jury might credit the plaintiff's assertion that the defendant destroyed his materials to keep him from proceeding on his appeal (he'd filed his notice of appeal in November 2010, some six months before he was released from RHU) or to get back at the plaintiff for filing an inmate complaint about the fraud-and-enterprise conduct report (the plaintiff filed that inmate complaint in March 2011, two months before he was released from RHU).

3. *If the Defendant Took the Plaintiff's Legal Materials, Did He Do It to Deprive the Plaintiff of Access to the Courts?*

The defendant admits that he destroyed some of the plaintiff's property on September 14, 2011, but the evidence shows that the defendant destroyed the confiscated property only after he had held it for three months past the June 27, 2011 deadline to dispose of the property, and only after the plaintiff had failed to come up with enough money to pay for the postage to ship the property to his mother. Nonetheless, a jury *might* credit the plaintiff's account.

4. *If the Defendant Took the Plaintiff's Legal Materials in an Effort to Deprive Him of Access to the Courts, Did He Succeed Such that He Injured the Plaintiff?*

While the plaintiff's claims are weak regarding the factors discussed above, it is here that the plaintiff's claim fails. On the facts in the record, no reasonable jury could conclude that the plaintiff was unable to pursue his various legal actions as a result of the defendant's actions.

The plaintiff was able to appeal his criminal conviction. Although he sought several extensions of time in which to file his brief, there is no evidence that the reason he asked for those extensions was because he was missing legal materials. He ended up filing his brief before the last extended deadline— in other words on time. The brief was fifty-four pages long. Nowhere in the brief does the plaintiff say that some of his transcripts or other legal materials were missing, or say that he could not make certain arguments because he did not have transcripts or other documents. In fact, while the brief is difficult to follow at times, the plaintiff appears to have quoted from many documents related to his trial, such as police reports, exchanges between lawyers and statements by the judge. Even assuming he didn't have all the transcripts he needed, the plaintiff alleged in that same brief that it was his *state defense counsel* who refused to give him the transcripts, not that the defendant took or destroyed them. The plaintiff also filed an eleven-page reply brief in support of his appeal.

Further, although the plaintiff did not *win* on appeal, the constitutional guarantee of *access* to the courts is not a guarantee of *success* in the courts. The plaintiff has not explained how the materials that he claims are missing

would have changed the outcome of his appeal. He has not said which opinions, which briefs and which court records are missing. He says that the three-ring binders that are missing contained criminal and civil laws and cases—some 3,000 to 4,000 pages worth. Dkt. No. 73 at 21. He does not explain why he needed these laws and cases to pursue his appeal, and his appellate briefs are filled with case citations. While he alleged in his June 2011 inmate complaint that transcripts were missing, the plaintiff never has argued that, for example, he was not able to tell the Court of Appeals about alleged errors at his trial because he did not have the transcript of that trial.

The same is true for the plaintiff's claim that the defendant caused him to miss the deadline for filing his petition for *certiorari* review of the fraud-and-enterprise conduct report. The plaintiff does not describe which missing documents prevented him from timely filing the petition, or how anything that he claims the defendant took or destroyed would have made it possible for him to file the petition on time. As noted, the plaintiff has claimed that he was missing "legal transcripts." "[T]ranscripts are not required to invoke a petition for certiorari." Martin v. McWilliams, No. 84 C 3599, 1986 WL 5199, at *2 (N.D. Ill. Apr. 25, 1986). That is especially true given that the plaintiff's *certiorari* petition related to his appeal from a denial of an inmate complaint, not from a court proceeding.

In Owens v. Evans, 878 F.3d 559, 565 (7th Cir. 2017), the Seventh Circuit concluded that an inmate couldn't establish "prejudice" without explaining "why" he needed access to his inmate grievances, supplies, and

"excess legal storage boxes" to prevail on his cases. The court noted that the inmate had to identify "specific negative consequences" from not having the legal materials he sought. Id. Like the plaintiff in Owens, the plaintiff in this case has made generalized and vague assertions that he needed his "legal property" to pursue his criminal appeal and petition for writ of *certiorari*, but he has not explain why or how the absence of these documents—whatever they were—affected the outcome of his cases.

Because no reasonable jury could conclude that whatever legal materials might have gone missing—even if the defendant took them and destroyed them in some effort to prevent the plaintiff from proceeding with his court cases—prevented the plaintiff from having his constitutional right of access to the courts, the court will grant the defendant's motion for summary judgment.[4]

## III.    CONCLUSON

The court **ORDERS** that the defendant's motion for summary judgment is **GRANTED**. Dkt. No. 62.

The court **ORDERS** that this case is **DISMISSED**. The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely

---

[4] The defendant also raised the defense of qualified immunity, dkt. no. 63 at 18-20, but the court need not address the issue because it has granted the defendant summary judgment on the merits.

requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 19th day of July, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**